## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
LAMAR JOHNSON,                          )
                                        )
    Plaintiff,                          )
                                        )
v.                                      )     Civil Action No. 04-448 (RBW)
                                        )
PAUL A. QUANDER,                        )
Director, Court Services and Offender   )
Supervision Agency for the District of  )
Columbia, et al.,                       )
                                        )
    Defendants.                         )
_____ )

## <u>MEMORANDUM OPINION</u>

        The plaintiff brings this action alleging that the DNA Analysis Backlog Elimination Act

of 2000, 42 U.S.C. § 14135b, ("the DNA Act") and D.C. Code § 22-4151, which was enacted by

the District of Columbia to implement in the District of Columbia the objectives of the DNA

Act, violate the Fourth and Fifth Amendments to the United States Constitution; the Ex Post

Facto Clauses of Article 1, sections 9 and 10 of the Constitution; the Health Insurance Portability

and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §§ 1320d to d-8; and the International

Convention of the Elimination of all Forms of Racial Discrimination (CERD).  Complaint

("Compl.") ¶¶ 14-20.  The defendants, pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6), have filed a motion to dismiss this action.  Defendants' Motion to Dismiss at 1.

Currently before the Court are the Defendants' Memorandum in Support of Motion to Dismiss

("Defs.' Mem."); the Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to

Dismiss ("Pl.'s Opp'n"); and the Defendants' Reply in Support of Motion to Dismiss ("Defs.'

Reply").  For the reasons set forth below, this Court grants the defendants' motion.

## I.   Background

**(A)   Statutory History**

Under the Violent Crime Control and Law Enforcement Act of 1994 ("1994 Act"), 42

U.S.C. § 14132, "Congress authorized the FBI to create a national index of [deoxyribonucleic

acid ("DNA")] samples taken from convicted offenders, crime scenes and victims of crime, and

unidentified human remains."  H.R. Rep. No. 106-900 at 8 (2000).  In response to this

congressional mandate, the FBI established the Combined DNA Index System ("CODIS").  Id.

The CODIS database provides a means for State and local forensic laboratories to share DNA

profiles in an attempt to "link evidence from crime scenes for which there are no suspects to

DNA samples of convicted offenders on file in the system."[1]  Id.  However, the 1994 Act was

interpreted by the FBI to only permit the creation of the CODIS, not the taking of DNA samples

of persons convicted of federal offenses for input into the system.  Id.  Thus, "the FBI requested

that Congress enact statutory authority to allow the taking of DNA samples from persons

committing Federal crimes of violence, robbery, and burglary, or similar crimes in the District of

Columbia or while in the military, and authorizing them to be included in CODIS."  Id.

Accordingly, Congress passed the DNA Analysis Backlog Elimination Act of 2000

("DNA Act"), 42 U.S.C. § 14135 et seq., which authorizes the "Attorney General to make grants

to eligible States . . . to carry out, for the inclusion in the Combined DNA Index System of the

---

[1]  United States v. Kincade, 379 F.3d 813, 817-20 (9th Cir. 2004) (en banc) provides an indepth discussion
of the process used to analyze a DNA sample.

Federal Bureau of Investigation, DNA analyses of samples taken from individuals convicted of a qualifying State offenses." 42 U.S.C. § 14135(a)(1).  Moreover, the DNA Act provides that "[t]he Director of the Bureau of Prisons shall collect a DNA sample from each individual in the custody of the Bureau of Prisons who is, or has been, convicted of a qualifying Federal offense" and that "the probation office responsible for the supervision under Federal law of an individual on probation, parole, or supervised release shall collect a DNA sample from each such individual who is or has been, convicted of a qualifying Federal offense." 42 U.S.C. § 15135a(a)(1)-(2).  In addition, Congress has mandated the collection of DNA samples from "each individual in the custody of the Bureau of Prisons who is, or has been convicted of a qualifying District of Columbia offense" or any "individual under the supervision of the Agency who is on supervised release, parole, or probation who is, or has been convicted of a qualifying District of Columbia offense."  42 U.S.C. § 14135b(a)(1)-(2).   Congress left to the District of Columbia the responsibility of determining which offenses under the District of Columbia Code should be deemed qualifying offenses.  42 U.S.C. § 14135b(d).  The District of Columbia has determined that forty-nine separate offense qualify for collection under the DNA Act.  See, D.C. Code § 22-4151(1) - (46).  These qualifying offense include, for example, arson, aggravated assault, burglary, kidnaping, robbery, attempted robber and carjacking.  Id.

Once a DNA sample is entered into the CODIS database, the information can only be released (1) "to criminal justice agencies for law enforcement identification purposes;" (2) "in judicial proceedings;" (3) "for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged;" or (4) "if personally identifiable information is removed, for a population statistics

3

database, for identification research and protocol development purposes, or for quality control

purposes." 42 U.S.C. § 14132(b)(3).  In addition, the DNA Act imposes criminal penalties for

individuals who improperly disclose sample results or improperly obtains or uses DNA samples.

42 U.S.C. § 14135e(c).

**(B)     Factual Background**

On December 20, 2001, the plaintiff, Lamar Johnson, was convicted in the Superior

Court of the District of Columbia of two counts of unarmed robbery in violation of D.C. Code

§ 22-2801.  Compl. ¶ 4.  On March 15, 2002, the plaintiff was sentenced to a one year prison

sentence and placed on two years supervised release for each conviction.  Id.  However,

execution of both sentences were suspended and the plaintiff was placed on two years probation

for each offense, which were designated to run concurrently.  Id.  On or around February 18,

2004, prior to the expiration of the plaintiff's probationary term, the defendants, pursuant to the

DNA Act and D.C. Code § 22-4151, demanded that the plaintiff provide a sample of his DNA

for inclusion in the CODIS because he had been convicted of a predicate offense.  Id. ¶ 9; see

also Compl., Ex. A; D.C. Code § 22-4151(27) (listing violations of D.C. Code § 22-2801

(robbery) as a qualifying offense).  The plaintiff refused to provide a DNA sample, and a judge of

the Superior Court of the District of Columbia ordered the plaintiff to show cause why his

probation should not be revoked because of this refusal.  Compl., Ex. B (Show Cause Order

signed by Judge Campbell, Associate Judge of the Superior Court of the District of Columbia).

On March 18, 2004, the plaintiff filed a complaint in this Court, seeking a temporary

restraining order ("TRO") to prevent the defendants from requiring that he provide a DNA

sample.  Motion for a Temporary Restraining Order at 1.  Before this Court could resolve the

4

TRO, the parties filed a Motion to Resolve Certain Preliminary Matters, which proposed to

resolve the need for emergency injunctive relief.  In the motion, the plaintiff agreed to provide a

blood sample to the defendants, and the defendants agreed to delay processing that sample until

after the plaintiff's claims in this action and any subsequent appeals had been resolved.  The

motion was granted by this Court and the motion for a TRO was denied.  The parties then filed

their papers which are the subject of this opinion.

## II.   Standards of Review

Under Rule 12(b)(1), which governs motions to dismiss for lack of subject matter

jurisdiction, "[t]he plaintiff bears the burden of persuasion to establish subject matter jurisdiction

by a preponderance of the evidence."  Pitney Bowes, Inc. v. United States Postal Serv., 27 F.

Supp. 2d 15, 19 (D.D.C. 1998).  In reviewing such a motion, this Court must accept as true all

the factual allegations contained in the complaint.  Leatherman v. Tarrant County Narcotics

Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).  Additionally, in deciding a Rule

12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations

in the complaint, but may also consider material outside of the pleadings in its effort to determine

whether the court has jurisdiction in the case.  See EEOC v. St. Francis Xavier Parochial Sch.,

117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Academy of Sciences., 974 F.2d 192,

197 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987); Grand Lodge of

Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).

On a motion to dismiss for failure to state a claim upon which relief can be granted

pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must construe the allegations

and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff

the benefit of all inferences that can be derived from the alleged facts.  Conley v. Gibson, 355

U.S. 41, 45-46 (1957); Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing Kowal v.

MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  However, the Court need

not accept inferences or conclusory allegations that are unsupported by the facts set forth in the

complaint.  Kowal, 16 F.3d at 1276.  In deciding whether to dismiss a claim under Rule 12(b)(6),

the Court can only consider the facts alleged in the complaint, documents attached as exhibits or

incorporated by reference into the complaint, and matters about which the Court may take

judicial notice.  St. Francis, 117 F.3d at 624-25.  The Court will dismiss a claim pursuant to Rule

12(b)(6) only if the defendant can demonstrate "beyond doubt that the plaintiff can prove no set

of facts in support of his claim which would entitle him to relief."  Conley, 355 U.S. at 45-46.

### III.   Legal Analysis

The plaintiff's complaint sets forth seven claims.   Compl. ¶¶ 14-20.  These claims assert

that it is illegal to demand the plaintiff's DNA while he was on probation, but that it is also

illegal for the defendants to retain the plaintiff's DNA sample and any information derived from

the sample now that he has completed his probationary term.  The Court begins its analysis by

discussing whether the DNA Act and D.C. Code § 22-4151 violate any constitutional or statutory

rights of the plaintiff while he was on probation.  The Court will conclude with a discussion of

whether the plaintiff, now that he has completed his probationary term, has a right to have his

DNA sample and analysis thereof expunged from the CODIS system.  As discussed more fully

below, none of the plaintiff's claims have merit.

**(A)   Fourth Amendment Claim**

The plaintiff first contends that the DNA Act and D.C. Code § 22-4151 violate the Fourth

6

Amendment's guarantee to be free from unreasonable searches and seizures.  Compl. ¶ 14.  The

Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend.

IV.  It is not disputed that the involuntary taking of a DNA sample is a search under the Fourth

Amendment.  See Skinner v. Railway Labor Executives Ass'n, 489 U.S. 602, 618 (1989) ("the

collection and subsequent analysis of the requisite biological samples must be deemed Fourth

Amendment searches").  Moreover, it is undisputed that a warrant was never issued requiring the

plaintiff to provide a DNA sample.  Accordingly, the focus of this Court's inquiry regarding the

plaintiff's Fourth Amendment claim is whether the statutory requirement that he provide the

sample is reasonable or falls within one of the Amendment's exceptions to the warrant-and-

probable cause requirements.  In a recent case substantially analogous to the case at hand, the

Ninth Circuit sitting en banc, provided an exhaustive overview of the law in this area.  United

States v. Kincade, 379 F.3d 813, 822-830 (9th Cir. 2004) (en banc).  While this Court need not

engage in the same extensive overview, it is helpful to this Court's analysis to briefly review

recent developments in Fourth Amendment jurisprudence.

    "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a

search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an

individual's privacy and, on the other, the degree to which it is needed for the promotion of

legitimate governmental interests.'" United States v. Knights, 534 U.S. 112, 118-19 (2001)

(quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)).  In addition to this fundamental

assessment of reasonableness based on the totality of the circumstances, there are a number of exceptions to the warrant-and-probable cause requirements of the Fourth Amendment. <u>Kincade</u>, 379 F.3d at 822. The Ninth Circuit in <u>Kincade</u> labeled the first of these exceptions as "exempted areas," which includes searches at the borders, airports, and entrances to government buildings. <u>Id.</u> The second exception encompasses "administrative searches," which includes inspections of closely-regulated businesses. <u>Id.</u> at 823. And finally, there is a "special needs" exception to the warrant-and-probable cause requirement. Cases involving this third exception "involve searches conducted for important non-law enforcement purposes in contexts where adherence to the warrant-and-probable cause requirement would be impracticable." <u>Id.</u> Thus, the question this Court must answer is whether the search and seizure at issue in this case (the taking of a DNA sample from a qualifying convicted felon) falls under one of these exceptions to the warrant clause of the Fourth Amendment or whether, based on the totality of the circumstances, it is reasonable.

While the issue presented to the Court is one of first impression in this Circuit, many other Federal Circuit, Federal District and state courts throughout the country have weighed in on this issue and have resoundingly concluded that the DNA Act and similar analogous state statutes do not violate the Fourth Amendment's protection against unreasonable searches and seizures.[2]

---

[2] This Court could only find three cases where courts found that a DNA collection statutes violated the Fourth Amendment. However, none of these cases remain good law. For example, in <u>United States v. Kincade</u>, 345 F.3d 1095, a three judge panel of the Ninth Circuit concluded that the DNA Act violated the Fourth Amendment. However, sitting en banc, the Ninth Circuit overruled the panel decision. <u>Kincade</u>, 379 F.3d at 831. In addition, before the en banc ruling in <u>Kincade</u>, a court in the Eastern District of California concluded that the DNA Act violated Fourth Amendment principles, <u>see</u> <u>United States v. Miles</u>, 228 F. Supp. 2d 1130, 1135-40 (E.D. Cal. 2002), but <u>Miles</u> is obviously not good law either as it was decided by a trial court in the Ninth Circuit. Finally, a Montgomery County Maryland Circuit Court in <u>Maryland v. Raines</u>, found a similar state statute unconstitutional as violative of the Fourth Amendment. This ruling, however, was vacated by the Court of Appeals of Maryland. <u>See</u>

(continued...)

In Kincade, the Ninth Circuit, sitting en banc, held that the DNA Act did not violate the Fourth

Amendment.  Kincade, 379 F.3d at 840.  However, as the Ninth Circuit noted in Kincade, courts

are split as to the proper analytical framework to apply in resolving this question.  One set of

courts, including the Ninth Circuit, have applied the traditional totality of the circumstances

analysis to assess reasonableness and have concluded that the DNA Act (and similar state

statutes) are constitutional.  See Kincade, 379 F.3d at 831 (citing over twenty cases in which an

assessment of the totality of the circumstances was utilized).[3]  On the other hand, other courts

have upheld the constitutionality of the DNA Act (and similar state statutes) under a "special

needs" analysis.  See Kincade, 379 F.3d at 830-31 (citing twelve cases in which a special needs

assessment was utilized).[4]  While this Court believes that the DNA Act can be upheld under

either analysis, for the reasons articulated by the Ninth Circuit in Kincade, this Court believes, as

do a majority of other courts which have examined this issue, that the traditional totality of the

circumstances analysis is the more appropriate legal framework under which to analyze this

question.[5]

---

[2](...continued)
Maryland v. Raines, 857 A.2d 19 (Md. 2004).

[3]  See, e.g., Green v. Berge, 354 F.3d 675, 680-81 (7th Cir. 2004) (Easterbrook, J. concurring); Groceman v. Dep't of Justice, 354 F.3d 411, 413-14 (5th Cir. 2004); Velasquez v. Woods, 329 F.3d 420, 421 (5th Cir. 2003); Jones v. Murray, 962 F.2d 302, 306-07 (4th Cir. 1992); Nicholas v. Goord, 2004 WL 1432533, at *2-*6 (S.D.N.Y. 2004); United States v. Stegman, 295 F. Supp. 2d 542, 548-50 (D. Md. 2003); Padgett v. Ferrero, 294 F. Supp. 2d 1338, 1343-44 (N.D. Ga. 2003).

[4]  See, e.g., Kincade, 379 F.3d at 840 (Gould, J., concurring); Green, 354 F.3d at 679; United States v. Kimler, 335 F.3d 1132, 1146 (10th Cir. 2003); Roe v. Marcotte, 193 F.3d 72, 79-82 (2d Cir. 1999); Vore v. Dep't of Justice, 281 F. Supp. 2d 1129, 1133-35 (D. Ariz. 2003); Miller v. U.S. Parole Comm'n, 259 F. Supp. 2d 1166, 1175-78 (D. Kan. 2003).

[5]  The Ninth Circuit in Kincade noted that the Supreme Court recently concluded in Knights that despite its prior Fourth Amendment rulings in City of Indianapolis v. Edmond, 531 U.S. 32 (2000) and Ferguson v. City of

(continued...)

To gauge the reasonableness of requiring the plaintiff to provide a DNA sample under the totality of the circumstances standard, the Court must balance the plaintiff's privacy interest against the public interests served by acquiring the sample. The Court begins its analysis by first assessing the plaintiff's privacy interests implicated by this search. <u>Knights</u>, 534 U.S. at 119.

The District of Columbia Circuit has noted that "[t]he protections of the Fourth Amendment are graduated in proportion to the privacy interests affected. Decreasing levels of intrusiveness require decreasing levels of justification." <u>Willner v. Thornburgh</u>, 928 F.2d 1185, 1188 (D.C. Cir. 1991). It is settled law that individuals on probation, just like parolees and other conditionally released criminal offenders, "are not entitled to the full panoply of rights and protections possessed by the general public." <u>Kincade</u>, 379 F.3d at 833; <u>Pa. Bd. of Prob. & Parole v. Scott</u>, 524 U.S. 357, 365 (1998)). In fact, the Supreme Court has held that individuals on conditional release have "only . . . conditional liberty properly dependent on observances of special parole restrictions" that extend "substantially beyond the ordinary restrictions imposed by law on an individual citizen." <u>Morrissey v. Brewer</u>, 408 U.S. 471, 478, 480 (1972). These type of restrictions "are meant to assure that the [conditional release terms] serve as a period of genuine rehabilitation and that the community is not harmed by the [releasee]'s being at large. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed." <u>Griffin v. Wisconsin</u>, 483 U.S. 868, 875 (1987). Accordingly, "the Supreme Court . . . has noted that conditional releasees enjoy severely constricted expectations of privacy

---

[5](...continued)

<u>Charleston</u>, 532 U.S. 67 (2001), "it remains <u>entirely</u> an open question whether suspicionless searches of conditional releasees pass constitutional muster when such searches are conducted for law enforcement purposes." <u>Kincade</u>, 379 F.3d at 830. Accordingly, the Ninth Circuit concluded that the totality of the circumstances analysis was the proper approach to employ in resolving this Fourth Amendment question. <u>Id.</u> at 832.

relative to the general citizenry—and that the government has a far more substantial interest in invading their privacy than it does in interfering with the liberty of law-abiding citizens" Kincade, 379 F.3d at 834 (citing Knights, 534 U.S. at 119-20; Ferguson v. City of Charleston, 532 U.S. 67, 79 n.15 (2001); Griffin, 483 U.S. at 874-75).

In this case, the plaintiff claims a privacy interest in the "detailed personal information obtainable from a DNA sample." Pl.'s Opp'n at 13. In its simplest form, the plaintiff asserts a privacy interest in his identity.[6] Kincade, 379 F.3d at 837 (a DNA sample taken from a probationer merely establishes a record of the plaintiff's identity). However, as discussed above, the plaintiff, at least during the time he was on probation, had a diminished expectation of privacy. Thus, while he does have a privacy interest in his identity, his interest does not have the same status as that of an individual who has never been convicted of a qualifying offense as classified by the DNA Act and the District of Columbia Code. Moreover, courts have routinely held, and this Court finds no compelling reason to deviate from these holdings, that "[o]nce a person is convicted of one of the felonies included as a predicate offense under [the DNA Act], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from blood sampling." Rise v. Oregon, 59 F.3d

---

[6] The plaintiff provides a thoughtful and thorough discussion of potential misuses of DNA. For example, the plaintiff opines that in the future a DNA sample may be able to provide other information about an individual, such as whether the individual has a hereditary disease, a specific character trait, and possibly even the individual's race. Pl.'s Opp'n at 14. These potential misuses, the plaintiff contends, results in the privacy prong of the reasonableness test weighing in his favor. Id. Although the hypotheticals offered by the plaintiff raise legitimate concerns, the Court must decide the constitutionality of the statutes before it based on the purpose for which they were designed and have been utilized, and not on how the plaintiff perceives the statutes might be used in the future. As drafted, the DNA Act limits the permissible use of DNA samples. 42 U.S.C. § 14132(b)(3) (limiting the use of DNA profiles to, inter alia, "criminal justice agencies for law enforcement purposes" and "in judicial proceedings"). Moreover, the statute prescribes criminal penalties for the improper acquisition, use or disclosure of DNA or of DNA sample results. 42 U.S.C. § 14135e(c). And, should the plaintiff's hypotheses one day come to fruition, the plaintiff can certainly challenge the improper use of these new developments in a subsequent action.

1556, 1560 (9th Cir. 1995); Groceman v. Dep't of Justice, 354 F.3d 411, 413-14 (5th Cir. 2004);

Jones v. Murray, 962 F.2d 302, 306-07 (4th Cir. 1992).

The Court's next step is to examine the public interest prong of the totality of the

circumstances test.  In this case, it is clear that the DNA Act and D.C. Code § 22-4151 further a

compelling public interest.  First, DNA profiling can link conditionally released offenders to

crimes committed while on release, which helps to ensure that such individuals comply with the

requirements of the their conditional release.  Scott, 524 U.S. at 365.  It is well-settled that rates

of recidivism among parolees and probationers is high and DNA testing can deter such

individuals from engaging in further illegal conduct knowing that they might be identified by

DNA.  Scott, 524 U.S. at 365; Knights, 534 U.S. at 120; Griffin, 483 U.S. at 875; United States

v. Crawford, 372 F.3d 1048, 1069-70 (9th Cir. 2004) (Trott, J., concurring).  Moreover, in

addition to helping solve crimes that may occur in the future, DNA profiling may help resolve

past crimes and "help[] bring closure to countless victims of crime who long have languished in

the knowledge that perpetrators remain at large."  Kincade, 379 F.3d at 839.  This Court agrees

with the Ninth Circuit that "the weight of these interests in monumental."  Id.

Balancing the private and public interests here, it is clear that the public's interests far

outweigh the plaintiff's interest and thus the taking of his DNA sample does not violate the

Fourth Amendment, especially in light of the fact that the plaintiff, while he was on probation,

has a diminished expectation of privacy.  In addition, the Court notes that the actual physical

intrusion in securing a DNA sample is minimal.  The Supreme Court concluded long ago that

"the intrusion occasioned by a blood test is not significant, since such 'tests are a commonplace

in these days of periodic physical examinations and experience with them teaches that the

quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.'" <u>Skinner</u>, 489 U.S. at 625 (quoting <u>Schmerber v. California</u>, 384 U.S. 757, 771 (1966)).  Moreover, the DNA Act applies only to anyone who has been convicted of one of the predicate offenses and there is no discretion regarding who is selected for DNA sampling.  "By ensuring that blood extractions will not be ordered randomly or for illegitimate purposes, [the DNA Act] fulfills a principal purpose of the warrant requirement."  <u>Rise</u>, 59 F.3d at 1562.  This reason further supports the finding that searches and seizures conducted pursuant to the DNA Act are reasonable.

In conclusion, it is the Court's view that upon weighing the individual privacy rights of the plaintiff against the compelling public interest as discussed above, that the totality of the circumstances favor the defendants' side of the totality of the circumstances analysis, and therefore, the plaintiff's Fourth Amendment challenge to the DNA Act and D.C. Code § 22-4151 must be rejected.

**(B)      Fifth Amendment Substantive Due Process Claim**

Next, the plaintiff makes a Fifth Amendment substantive due process claim against the DNA Act and D.C. Code § 22-4151.  Specifically, the plaintiff posits that as "a free citizen who has entirely paid his debt to society, [he] objects to the tremendously invasive and utterly suspicionless search with the potential to reveal his most intimate genetic and medical information."  Pl.'s Opp'n at 18.  It appears that what the plaintiff is alleging is that the DNA Act and D.C. Code § 22-4151 violate his right "to protect [his] genetic information from disclosure[]" and that this amounts to a substantive due process violation.  Pl.'s Opp'n at 20.  The Fifth Amendment provides that no person may "be deprived of life, liberty, or property,

13

without due process of law." U.S. Const. amend V. In reviewing substantive due process

claims, the Supreme Court has instructed that there are two features to such a claim. "First, [the

Court has] regularly observed that the Due Process Clause specially protects those fundamental

rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'

and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if

they were sacrificed.'" Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (internal

citations omitted). Second, the Court requires "in substantive-due-process cases a 'careful

description' of the asserted fundamental liberty interest." Id. (internal citations omitted). Thus,

the "[Fifth] Amendment 'forbids the government to infringe [on] . . . 'fundamental' liberty

interests at all, no matter what process is provided, unless the infringement is narrowly tailored to

serve a compelling state interest.' Id. (internal citations omitted).

Other courts that have addressed this same substantive due process challenge to the

required submission of DNA samples by conditionally released offenders have declared that the

"drawing of blood by a medical professional in an acceptable environment is not offensive to the

ordinary sense of justice, and therefore, not violative of the Due Process Clause." Vore v. Dep't

of Justice, 281 F. Supp. 2d 1129, 1138 (D. Ariz. 2003) (citing Schmerber v. California, 384 U.S.

757, 759-60 (1966)); see also Rise, 59 F.3d at 1562-63; Groceman v. Dep't of Justice, 2002 WL

1398559, at *4 (N.D. Tex. 2002); Miller v. U.S. Parole Comm'n, 259 F. Supp. 2d 1166, 1169-70

(D. Kan. 2003). However, despite the analyses these courts conducted, this Court concludes that

a substantive due process analysis is actually unnecessary. In Graham v. Connor, 490 U.S. 386

(1989), the Supreme Court held that "[w]here a particular [Constitutional] Amendment provides

an explicit textual source of constitutional protection against a particular sort of governmental

14

behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham, 490 U.S. at 395); see also United States v. Lanier, 520 U.S. 259, 272 n.7 (1997) ("Graham simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."). A substantive due process analysis is therefore inappropriate in this case if the plaintiff's claim is covered by the Fourth Amendment. County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998). Here, it is clear that the plaintiff's constitutional challenge is "covered by" the Fourth Amendment. As discussed above, it is without question that the taking of blood for DNA analysis is a "search and seizure" under the Fourth Amendment. Accordingly, the Fourth Amendment, and not the substantive due process guarantees of the Fifth Amendment, is the proper benchmark under which the plaintiff's claim must be evaluated. The plaintiff's substantive due process claim must therefore be dismissed.

**(C)   Fifth Amendment Procedural Due Process Claim**

The plaintiff also challenges the constitutionality of the DNA Act and D.C. Code § 22-4151 on the ground that "[t]he taking of Mr. Johnson's DNA without cause, without any legitimate governmental purpose and entirely without any mechanism or opportunity for Mr. Johnson to object violated Mr. Johnson's right to procedural due process."  Pl.'s Opp'n at 22. Here, the crux of the plaintiff's argument is that the two statutory provisions do not require individualized determinations, prior to the blood sample being taken, that qualifying individuals are "likely to recidivate via a crime with biological evidence." Pl.'s Opp'n at 22-23.  In addition,

the plaintiff contends that the DNA Act "has no internal guidelines for determining if a particular individual has actually been convicted of [a] qualifying offense." Id. at 23. The plaintiff opines that because the statute is without procedural mechanisms to challenge the government's collection of the sample, and to petition for the destruction or return of a sample once an individual has completed his term of community supervision, nor do the statutes place a limitation on the government's use of the information acquired from the sample, there is a high risk of erroneous deprivation of the plaintiff's liberty interest in his DNA. Id. at 24. This challenge must also be rejected.

Similar arguments have been rejected by both the Ninth and Tenth Circuits. In Rise, the Ninth Circuit concluded that "[t]he extraction of blood from an individual in a simple, medically acceptable manner, despite the individual's lack of an opportunity to object to the procedure, does not implicate the Due Process Clause." Rise, 59 F.3d at 1562-63. Moreover, the Court noted that "[b]ecause the only criterion under [the DNA Act] for extracting blood is a conviction for a predicate offense, there would be little of substance to contest at any provided hearing." Id. at 1563. Accordingly, the Ninth Circuit rejected the plaintiff's procedural due process claims. The Tenth Circuit, relying on part in the Ninth Circuit's decision in Rise, also rejected the arguments that a plaintiff was denied procedural due process when his blood was taken for a DNA sample. Boling v. Romer, 101 F.3d 1336, 1340-41 (10th Cir. 1996). Most recently, the United States District Court for the District of Kansas, relying on Boling, concluded that there was no procedural due process violation by requiring the plaintiff's to submit a blood sample pursuant to the DNA Act. Miller, 259 F. Supp. 2d at 1169-70. Miller also noted that "even if [the] Plaintiff's challenge is the enactment of the law, rather than the method of the blood draw,

his argument fails.  When legislation affects a general class, the legislative process satisfies due process requirements."  Id. at 1169.

"The fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."  Carey v. Piphus, 435 U.S. 247, 259 (1978).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey, 408 U.S. at 481.  In resolving claims that an individuals procedural due process rights have been violated, three factors are considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.[7]

Applying the three Mathews factors here, it is clear that the plaintiff's procedural due

---

[7]  The defendants invite this Court to conclude that because Congress and the District of Columbia City Council have passed "a law which affects a general class of persons, those persons have received all procedural due process—the legislative process" that is due to them.  Def.'s Reply at 9 (quoting County Line Joint Venture v. City of Grand Prarie, 839 F.2d 1142, 1144 (5th Cir. 1988)).  While the defendants accurately quote what the Fifth Circuit said, it is clear after a careful reading of County Line that it is simply not analogous to the case at hand.  County Line and virtually every case adopting its logic address issues regarding land-use regulations.  See, e.g., 75 Acres, LLC v. Miami-Dade County, Fla., 338 F.3d 1288, 1295 (11th Cir. 2003); Jackson Court Condos., Inc. v. City of New Orleans, 874 F.2d 1070 (5th Cir. 1989); but see Moss v. Cole, 2004 WL 2248262 (N.D. Tex. 2004) (cursorily dismissing pro se plaintiff's Fifth and Fourteenth Amendment procedural due process claims because he was afforded all the process he was due in the legislative process).  Accordingly, this line of cases does not persuade the Court that the passage of the DNA Act and D.C. Code § 22-4151 alone provides all the process the plaintiff is due.

process claim has no merit.[8]  This Court has already discussed at length the applicable private

and public interest in its discussion of the plaintiff's Fourth Amendment claim.  As discussed

previously, the private interest at stake in this case is the plaintiff's right to the privacy of his

identifying information, i.e., his DNA sample and the information derived from it.  However, as

this Court discussed in its Fourth Amendment analysis, this privacy right was significantly

diminished while the plaintiff was on probation.  On the other hand, the government has a

compelling interest to ensure that individuals who are on probation do not commit any further

crimes and to solve both past and future crimes, which trumped the plaintiff's diminished privacy

rights.  Thus, the only factor that warrants additional discussion here is the risk of erroneous

deprivation.

As to this remaining factor, the plaintiff argues that the DNA Act "has no internal

guidelines for determining if a particular individual has actually been convicted of [a] qualifying

offense." Pl.'s Opp'n at 23.  The plaintiff further opines that because there are no procedures in

place to challenge the government's acquisition and testing of samples, to petition for the

destruction or return of a DNA sample once an individual has completed his probation, or limit

the government's use of the information derived from the sample, there is a high risk of

erroneous deprivation of the plaintiff's liberty interest in his DNA.  Id. at 24.  However, this

Court finds that the risk of erroneous deprivation is minimal at best.  First, the DNA Act itself

provides that a sample can only be collected from an individual who has been convicted of a

_____

[8]  The Court limits its analysis to the period of time during which the plaintiff was on probation because that
is the time during which the defendants demanded the plaintiff's DNA sample and thus the period when any alleged
procedural due process violations occurred.  The plaintiff also seems to suggest that his procedural due process
rights were violated because the statute does not provide for a right of expungement of his DNA sample after his
probationary term expired. Pl's Opp'n at 24.  As this Court will more fully discuss below, see infra, part III(G), the
plaintiff has no right to expungement of his DNA sample or the information contained in the CODIS database.

18

qualifying offense.  Thus, a person will only be required to submit a DNA sample if a judge or

jury has determined, beyond a reasonable doubt, that the individual has committed the offense or

the individual has acknowledged his guilt by entering a guilty plea.  The procedures associated

with these judicial proceedings for assessing guilt provide sufficient process to ensure that a

person is not erroneously convicted of a predicate offense.  In addition, the statute provides that if

a conviction for a predicate offense is later overturned or reversed on appeal, the individual's

DNA information may be removed from the CODIS database.  42 U.S.C. § 14132(d).  Thus, the

prospect that an innocent individual's DNA would be erroneously included in the CODIS

database is minimal.  Moreover, should there be a question as to the proper application of the

statute's requirements, i.e., if an offense is a "qualifying offense" to warrant the taking and

processing of a DNA sample, a person can always bring a challenge in a court of competent

jurisdiction.  Finally, the statute explicitly limits how DNA samples can be used.  Namely, the

DNA sample, once obtained, is sent to the Director of the Federal Bureau of Investigation for

analysis and inclusion in the CODIS database.  42 U.S.C. § 14135b(b).  And such analysis is only

conducted to determine "identification information in a bodily sample." 42 U.S.C.

§ 14135b(c)(2).  In conclusion, the risk of erroneous deprivation, while conceivable, is remote.[9]

Accordingly, the plaintiff's procedural due process claim is without merit and therefore must be

dismissed.

---

[9]  The plaintiff also contends that there is a risk of "false matches" from the use of the information
contained in CODIS database, thus creating a substantial risk that an individual could be implicated in a crime he did
not commit.  Pl.'s Opp'n at 23-24.  He has submitted two declarations of scientific witnesses to support this theory.
Pl.'s Opp'n, Ex. B (declaration of Greg Hampikian); Ex. C. (declaration of Dan Krane).  Assuming the accuracy of
the declarations, there is no impediment to a challenge being made to an alleged false match if the government
initiates action against an individual based on an alleged erroneous match.  Moreover, this Court concludes that the
possibility that the CODIS database may produce "false matches" does not outweigh the government's
countervailing compelling interests.

**(D)     Fifth Amendment Equal Protection Claim**

The plaintiff also contends that the DNA Act and D.C. Code § 22-4151 violate the equal

protection component of the Fifth Amendment[10] because they allegedly discriminate against him

on the basis of race.  Pl.'s Opp'n at 25.  The graveman of this claim is that the two statutory

provisions have been created and implemented with discriminatory intent.  Id.  Specifically, the

plaintiff contends that the provisions have a disproportionate impact on racial minorities,

especially African Americans males, because, for example, African American males are

incarcerated at a much higher rate than white males.  Id. at 26-27.  Accordingly, the plaintiff

opines that a disproportionate number of African American men are subject to mandatory DNA

testing.  Id. at 26-27.  Moreover, the plaintiff posits that the United States has a long history of

conducting discriminatory criminal investigations against minorities and disregarding the privacy

rights of minorities.  Id. at 27.  Therefore, the plaintiff argues that because the DNA Act and D.C.

Code § 22-4151 were purportedly enacted with an intent to discriminate, his equal protection

claim must be reviewed under the "strict scrutiny" standard of review.  Id. at 25.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State

shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

essentially a direction that all persons similarly situated should be treated alike."  City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S.

202, 216 (1982)).  "The general rule is that legislation is presumed to be valid and will be

sustained if the classification drawn by the statute is rationally related to a legitimate state

---

[10]   The equal protection component of the Fifth Amendment is derived from the Amendment's due process
clause.  Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 616 (1991).

interest." Id. at 440.  However, "when a statute classifies by race, alienage, or national origin,"

courts must apply a "strict scrutiny" standard of review.  Id.   Accordingly, this Court must first

determine what level of review it must employ in this case.

The plaintiff argues the DNA Act and D.C. Code § 22-4151 must withstand the

heightened standard of review of strict scrutiny because their adoption and implementation have

been "motived by . . . racially discriminatory purpose[s]."  Pl.'s Opp'n at 30.  The plaintiff's

argument in this regard is meritless.  Despite the plaintiff's best effort to parse out portions of the

legislative history of D.C. Code § 22-4151, there is simply no evidence, actual or circumstantial,

that the District of Columbia Council ("D.C. Council") enacted D.C. Code § 22-4151 with any

discriminatory intent.  Moreover, the plaintiff does not point to any evidence in the legislative

history of the DNA Act to suggest Congress had a discriminatory motive when it adopted the

legislation.

In addition, the plaintiff claims that discriminatory intent can be inferred because the

government should have been aware of the historical discriminatory impact the criminal justice

system has had on racial and ethic minorities also has no merit.[11]  The plaintiff's position is

similar to arguments rejected by courts concerning whether the Federal Sentencing Guidelines

violate the Equal Protection Clause as a result of the statistical proof that African-American's are

convicted more often of drug crimes involving crack cocaine, while Caucasians are convicted at

a statistically higher rate for drug offenses involving powder cocaine, which exposes them to less

serious punishment.  Courts which have addressed this issue have routinely affirmed the differing

---

[11]  The plaintiff does not allege, nor can he, that an individual on probation is part of a suspect class
warranting "strict scrutiny" review of his equal protection claim.  See Nicholas v. Riley, 874 F. Supp. 10, 12 (D.D.C.
1995), aff'd 1995 WL 686227 (D.C. Cir. 1995).

sentences based on the equal protection rational basis analysis, despite the statistical disparities.

See, e.g., United States v. Holton, 116. F.3d 1536, 1548-49 (D.C. Cir. 1997); United States v.

Watson, 953 F.2d 895, 897-98 (5th Cir. 1992).  In Holton, the District of Columbia Circuit noted

that when

> analyzing whether the sentencing disparity denies constitutional equal protection, the first
> inquiry is whether the mandatory crack minimums discriminate based on race.  In order to
> prove that a facially neutral statute, such as the one involved here, violates equal
> protection guarantees, a challenger must demonstrate a racially discriminatory purpose
> behind the statute.

Holton, 116 F.3d at 1548 (citing Washington v. Davis, 426 U.S. 229, 239 (1976)).  The court

further noted that while "[d]isparate racial impact can be probative of such purpose, . . . it is not

dispositive without more."  Id.  Applying this analytical framework to this case leads the Court to

the conclusion that the plaintiff has simply failed to produce any evidence that the facially neutral

statutes at issue here were enacted with a discriminatory purpose.  In fact, the only evidence

offered by the plaintiff in this regard is proof that the overall criminal justice system nationally,

and specifically in the District of Columbia, has a disparate impact on the African American

population.  And this alone is simply insufficient to demonstrate discriminatory intent.  Id.

Accordingly, the plaintiff's equal protection challenge must be rejected if there is a rational basis

for the statutes' enactment and enforcement is predicated on a legitimate state interest.  City of

Cleburne, 473 U.S. at 441.

In fact, the plaintiff has failed to even invoke the protections provided by the Equal

Protection Clause.  As noted earlier, as a predicate to evoking the protections of the Equal

Protection Clause, the plaintiff must demonstrate that he was similarly situated to other non-

minority D.C. Code offenders who were treated differently.  See Plyer v. Doe, 457 U.S. 202

(1982); <u>Cook v. Babbitt</u>, 819 F. Supp. 1, 11 (D.D.C. 1993) (citing <u>City of Cleburne</u>, 473 U.S. at

439).  Here, the law in question makes no distinction between offenders on the basis of their race.

If an offender is convicted of one of the qualifying offenses, then, without regard to the

offender's race, he or she is required to submit a DNA sample.  In any event, as already discussed

at length, the government has compelling interests in securing and processing DNA samples of

individuals with qualifying convictions, <u>i.e</u>, ensuring compliance with conditional release

requirements, preventing future crimes, and solving past and future offenses.  Clearly, the

compulsory taking of DNA samples is rationally related to these legitimate state interests.

Therefore, the plaintiff's equal protection claim must be dismissed.

**(E)       Ex Post Facto Clause Claim**

The plaintiff further argues that the DNA Act and D.C. Code § 22-4151 violate the Ex

Post Facto Clause provisions of Article 1, sections 9 and 10 of the Constitution because the D.C.

Code provision implementing the DNA Act was signed after the plaintiff was convicted and

sentenced in his underlying criminal case.  Pl.'s Opp'n at 31.  "The constitutional bar on the

enactment of ex post facto laws means that '[l]egislatures may not retroactively alter the

definition of crimes or increase the punishment for criminal acts.'"  <u>Blair-Bey v. Quick</u>, 151 F.3d

1036, 1048 (D.C. Cir. 1998) (quoting <u>Collins v. Youngblood</u>, 497 U.S. 37, 43 (1990)).  Thus,

> [a] law implicates the Ex Post Facto Clause only if it criminalizes conduct that was not a
> crime when it was committed, increases the punishment for a crime beyond what it was at
> the time the act was committed, or deprives a person of a defense available at the time the
> act was committed.

<u>Rise</u>, 59 F.3d at 1562 (citing <u>Collins</u>, 497 U.S. at 42-43).  To determine whether a statute violates

the Ex Post Facto Clause, the Court must engage in a two step analysis.[12]  Smith v. Doe, 538 U.S. 84, 92 (2003) .  First, this Court must determine if the legislative bodies, through the enactment of the DNA Act and D.C. Code § 22-4151, intended to impose a criminal punishment.  Id.  If the intention was to impose a criminal punishment, then the Ex Post Facto Clause applies.  Id.  However, if the legislature intended to create a civil and non-punitive scheme, the Court must determine whether the statute is nevertheless "'so punitive either in purpose or effect as to negate [the legislature's] intention' to deem it 'civil.'"  Id.

Just as courts have upheld the constitutionality of the DNA Act under the Fourth Amendment, so to have courts found that the DNA Act does not run afoul of the Ex Post Facto Clause.  See, e.g., Rise, 59 F.3d at 1562; Jones, 962 F.2d at 308-10; United States v. Reynard, 220 F. Supp. 2d 1142, 1157-1162 (S.D. Cal. 2002); Raines, 857 A.2d at 25-41.  The analyses by the courts that have addressed the question are convincing and this Court declines to take a different position.

The plaintiff first argues that the DNA Act, as implemented in the District of Columbia by the D.C. Council, is punitive and thus violates the Ex Post Facto Clause.  Pl.'s Opp'n at 32.  To support this conclusion, the plaintiff alleges that (1) the District of Columbia statutory provision is codified in Title 22 of the District of Columbia Code which is titled "Criminal Offenses and Penalties;" (2) the Bureau of Prisons and Court Services and Offender Supervision Agency administer the program; and (3) DNA collection is now a condition of probation, making

---

[12] As a predicate to this analysis, of course, the Court must first determine whether the statute in question was intended to be applied or is being applied retroactively.  See, e.g., INS v. St. Cyr, 533 U.S. 289 (2001).  The parities concede that the statutes in question were intended to have a retroactive affect, accordingly, this Court need not engage in this analysis.  Defs.' Reply at 12 ("plain language of the DNA Act calls for retroactive application"); Pl.'s Opp'n at 31 ("The issue here is merely whether the DNA Act 'makes more burdensome the punishment for a crime.'").

it part of a defendant's sentence.  Id.  Moreover, the plaintiff opines that the D.C. Council, when enacting D.C. Code § 22-4151, intended for the legislation to be punitive in nature.  Id.  Finally, the plaintiff contends that even if the statute is considered to be civil in nature and not punitive, its effect is sufficiently punitive to implicate the Ex Post Facto Clause.  Id. at 33.

The Court begins by noting that there are two distinct statutes in play.  The first is the DNA Act passed by Congress.  42 U.S.C. § 14135 et seq.  The second is the application of the DNA Act by the D.C. Council to certain "qualifying offenses" through the enactment of  D.C. Code § 22-4151.  The plaintiff's argument attempts to conflates the two statutes, which were created by two separate legislative bodies, in his effort to strengthen his argument that the legislative intent underlying the DNA Act and the District of Columbia implementing statute demonstrate that DNA collection is intended to be punitive.  This Court cannot accept the plaintiff's reasoning.

The congressionally enacted DNA Act mandates that the Bureau of Prisons and Court Services and Offenders Supervision Agency administer the process of securing DNA samples from qualifying individuals.  42 U.S.C. § 14135b(a)(1)-(2).  Moreover, the requirement that qualifying individuals provide DNA samples as a condition of post-conviction community release is also contained in the congressionally enacted legislation.  42 U.S.C. § 14135c.  Contrary to the plaintiff's position, the DNA Act was not intended by Congress to be punitive.  As noted by another district court:

> The legislative history of the DNA Act demonstrates that Congress did not create the Act as a means for punishing qualifying offenders for past convictions.  Instead, Congress desired to assist law enforcement agencies to perform their basic law enforcement function by "match[ing] DNA samples from crime scenes where there are no suspects with the DNA of convicted offenders."  146 Cong. Rec. H8572-01, at *H8575.

25

> Additionally, Congress intended to increase the efficacy of the criminal justice system by "eliminat[ing] the prospect that innocent individuals w[ill] be wrongly held for crimes that they did not commit." Id. at *H8576.  Furthermore, Congress desired to prevent violent felons from repeating their crimes in the future. 146 Cong. Rec. S11645-02, at *S11646 ("Statistics show that many of these violent felons will repeat their crimes once they are back in society").  This legislative history indicates that Congress did not authorize blood draws under the DNA Act to "punish" qualifying offenders.

Reynard, 220 F. Supp. 2d at 1161.  This Court agrees with this analysis.  It is one thing to impose

criminal sanctions for the commission of criminal conduct while it is quite another thing to

establish mechanisms designed to deter or detect criminal conduct.  The former is punishment,

the latter is not.  Moreover, as discussed more fully below, the DNA Act does not have the

punitive effect necessary to implicate the Ex Post Facto Clause.  Id. at 1161-62; see also Jones,

962 F.2d at 309; Rise, 59 F.3d at 1562.

In his attempt to demonstrate that the D.C. Council's enactment of the local qualifying

offense component of the DNA Act was intended to be punitive, the plaintiff relies on the

location of the provision in the D.C. Code (Title 22 "Criminal Offenses and Penalties") and the

report from the D.C. Council on the bill.  Pl.'s Opp'n at 32.  First, the location of this provision

does not, by itself, show that D.C. Code § 22-4151 was intended by the D.C. Council to be

punitive in nature.  As noted by the Supreme Court, "[t]he location and labels of a statutory

provision do not by themselves transform a civil remedy into a criminal one." Smith, 538 U.S. at

94; cf., Johnston v. Comm'r of Internal Revenue, 114 F.3d 145, 150 (10th Cir. 1997) (holding

that "under the general rules of statutory interpretation, the title to a statutory provision is not part

of the law itself, although it can be used to interpret an ambiguous statute." ).

Moreover, the plaintiff's reliance on the D.C. Council's Committee the Judiciary Report

on Bill 14-63, entitled the DNA Sample Collection Act of 2001, (April 24, 2001) (hereinafter

"D.C. Council Report"), does not aid his cause.  The plaintiff first contends that a statement by former Councilmember Harold Brazil supporting an amendment to expand the number of qualifying offenses buttress his conclusion that D.C. Code § 22-4151 was enacted to punish criminal defendants.  Pl.'s Opp'n at 32-33 (citing D.C. Council Report at 14-15).  The Court cannot agree.  The Court does not construe the former Councilmember's statements as reflecting his intent to make the DNA requirement punitive.[13]  But even if that construction can be attached to the remarks, they were merely statements by one member of the Council, not the sentiment of the entire body and are thus deserving of little weight.  See, e.g., Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 (1980) ("ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history.").  Moreover, the amendment to expand the number of qualifying offenses was not adopted.  D.C. Council Report at 15.  Accordingly, it appears that the majority of the Council disagreed with former Councilmember Brazil's position.

The plaintiff also references a portion of the Report which reads:  "[i]t is the Committee's view that the mere possibility that someone convicted of a property crime or low level felony may commit a more serious crime in the future is insufficient to justify the significant invasion of privacy at issue here."  Id. at 6.  The plaintiff opines that this statement "reveals a clearly retributive legislative rationale in the D.C. Council's discussion of the appropriate extent of the Act."  Pl.'s Opp'n at 32.  The plaintiff's reading of this statement misses the mark.  When viewing the Report as a whole, rather than in fragmented sections, it is clear that this statement

---

[13]  Former Councilmember Brazil stated that while he supported the bill, he believes it should be expanded to include a greater number of qualifying offenses.  He noted "these are people who are convicted of crimes."  D.C. Council Report at 14-15.

reflects the D.C. Council's view that it had attempted to carefully balance legitimate law

enforcement objectives with privacy rights in determining what offenses merited DNA sample

collection.  This effort to reach the appropriate balance fails to demonstrate that the D.C. Council

intended D.C. Code § 22-4151 to be punitive.  Such a reading is simply not a reasonable

interpretation of the Council's Report.   Thus, since neither the DNA Act, nor the D.C. Code

provision implementing it in the District of Columbia were intended to be punitive in nature, this

Court must now assess whether the statute is nonetheless so punitive, either in purpose or effect,

that the legislative intent becomes irrelevant.

In making this second determination, the Court is guided by seven factors enunciated by

the Supreme Court in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963).

Specifically, the Court stated that "[a]bsent conclusive evidence of congressional intent as to the

penal nature of a statute, these factors must be considered in relation to the statute on its face."

Id. at 168.

> Whether the sanction involves an affirmative disability or restraint, whether it has
> historically been regarded as a punishment, whether it comes into play only on a finding
> of scienter, whether its operation will promote the traditional aims of
> punishment—retribution and deterrence, whether the behavior to which it applies is
> already a crime, whether an alternative purpose to which it may rationally be connected is
> assignable for it, and whether it appears excessive in relation to the alternative purpose
> assigned are all relevant to the inquiry, and may often point in differing directions.

Id. at 168-69.  Applying these factors to both the DNA Act and the District of Columbia statute

does not call for the conclusion that these two statutory provisions violate the Ex Post Facto

Clause.

First, to assess whether the statutes invoke an  "affirmative disability" or "restraint" the

Court must "inquire how the effects of the [statute] are felt by those subject to it.  If the disability

or restraint is minor and indirect, its effects are unlikely to be punitive." Hatton v. Bonner, 356

F.3d 955, 963 (9th Cir. 2004) (internal quotation marks omitted).  In this case, the DNA Act

requires individuals to submit only one DNA sample and requires no further action by the

individual, therefore, the "affirmative disability or restraint" is minimal.  42 U.S.C.

§ 14135b(a)(1)-(2) ("The Director of the Bureau of Prisons shall collect a DNA sample . . . .")

(emphasis added);[14] see Russell v. Gregoire, 124 F.3d 1079, 1082, 1088 (9th Cir. 1997) (sex

offender registration requirement enacted after plaintiff's conviction held not to violate Ex Post

Fact Clause because, inter alia, the restraint placed on the plaintiff to register as a sex-offender

was minimal).  Second, the plaintiff concedes that although they contend that DNA sampling is

punishment, the second factor does not come into play in this case since there is no history of the

use of DNA sampling as punishment.  See Pl.'s Opp'n at 33 n.26.  However, as discussed below,

there is a history of using conditions of release as a deterrent, and since DNA sampling is a

condition of release, it could be viewed as punishment.  See, e.g., Reynard, 220 F. Supp. 2d at

1162.  Third, there is no scienter component to either the DNA Act or D.C. Code § 22-4151.

"Fourth, conditions of supervised release have not historically been regarded as punishment, but

instead as a means to further the deterrent, protective, and rehabilitative goals of sentencing."

Reynard, 220 F. Supp. 2d at 1162 (citing United States v. Eyler, 67 F.3d 1386, 1393 (9th Cir.

1995)).  This factor could support both the plaintiff's and the defendants' positions because DNA

sampling does serve as a deterrent, but was not created for retribution.  Fifth, an individual's

failure to comply with the requirement to provide a sample is punishable under the DNA Act as a

---

[14]  However, the Director of the Bureau of Prisons or an agency "may (but need not) collect a DNA sample from" an individual who's DNA analysis is already contained in the CODIS database.  42 U.S.C. § 14135b(a)(3).

separate offense—a class A misdemeanor—as opposed to enhancing the sentence previously

imposed for the qualifying offense.  42 U.S.C. § 14135a(a)(5)(A)-(B).  In addition, the legislative

history of the DNA Act indicates that there is a non-punitive, alternative purpose underlying its

enactment—"eliminat[ing] the prospect that innocent individuals w[ill] be wrongly held for

crimes they did not commit."  146 Cong. Rec. H8572-01, at *H8576.  Balancing these factors, it

is clear that neither the DNA Act nor D.C. Code § 22-4151 criminalize any conduct of the

plaintiff committed prior to the statutes' enactment, nor do the statutes inflict any greater

punishment for such conduct.  Rather, the Act simply, in a reasonable fashion, creates a new

regulatory system for the maintenance of DNA samples in order to serve various legitimate law

enforcement functions.  Moreover, failure to comply with this new regulatory system provides

for a penalty separate and apart from the penalty for the underlying qualifying offense.[15]

Accordingly, neither the DNA Act nor D.C. Code § 22-4151 offend the Ex Post Facto Clause and

the plaintiff's claim asserting this constitutional violation must be dismissed.

**(F)     Health Insurance Portability and Accountability Act Claim**

The plaintiff also contends that the DNA Act violates the Health Insurance Portabilty and

Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §§ 1320d to d-8, by "disclosing highly

sensitive medical and genetic information in which [the plaintiff] has a strong privacy interest."

Compl. ¶ 19.  The HIPAA imposes requirements on the Department of Health and Human

Services, health plans, and healthcare providers involved in the exchange of health information

---

[15]  Admittedly, because submission of a DNA sample is now a condition of release for individuals on probation, parole, or supervised release, failure to comply with this condition could result in their release being terminated.  However, this potential consequence does not increase the punishment for the commission of the underlying offense and therefore does not alter this Court's Ex Post Facto Clause analysis. See, e.g., Jones, 962 F.2d at 309-310.

to protect the confidentiality of such information and provides for both civil and criminal penalties for individuals who improperly handle or disclose individually identifiable health information.  42 U.S.C. §§ 1320d to d-8.  The defendants contend that the HIPAA does not provide for a private right of action and therefore this statutorily based claim cannot be maintained because the government has not waived its sovereign immunity.  Def.'s Reply at 16-17.  The plaintiff counters that a private right of action can be implied in the statute.  Pl.'s Opp'n at 34.

In order for this Court to find that there is an implied private right of action under the HIPAA, this Court must determine whether Congress intended to create such a right.  Anderson v. USAir, Inc., 818 F.2d 49, 54 (D.C. Cir. 1987).

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.   The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.  Statutory intent on this latter point is determinative.  Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001) (internal citations omitted).  While only a handful of courts have examined whether a private right of action is implied under the HIPAA, each Court has rejected the position.  See O'Donnell v. Blue Cross Blue Shield of Wyo., 173 F. Supp. 2d 1176 (D. Wyo. 2001); Brock v. Provident Am. Ins. Co., 144 F. Supp. 2d 652 (N.D. Tex. 2001); Means v. Indep. Life and Accident Ins. Co., 963 F. Supp. 1131 (M.D. Ala. 1997); Wright v. Combined Ins. Co. of Am., 959 F. Supp. 356 (M.D. Miss. 1997).   In fact, the most recent opinion to address this question was written by another member of this court.  In Logan v. Dep't of Veterans Affairs, No. 02-701, 2004 WL 3168183, ___ F. Supp. 2d ___ (D.D.C. July 28,

2004), after reviewing the HIPAA provisions governing the disclosure of individually

identifiable health information, the court concluded that

> Congress enacted HIPAA, in part, to address concerns about the confidentiality of health information, particularly in the era of electronic communication.  Section 262 of HIPAA (codified as 42 U.S.C. §§ 1320d to d-8) defines terms and imposes requirements on the Department of Health and Human Services ("HHS"), health plans, and healthcare providers involved in the exchange of health information.  HIPAA provides for both civil and criminal penalties to be imposed upon individuals who improperly handle or disclose individually identifiable health information.  42 U.S.C. §§ 1320d-5 to d-6.  However, the law specifically indicates that the Secretary of HHS shall pursue the action against an alleged offender, not a private individual.

Id. at *4.  In Logan, a government employee attempted to bring an action against the government

for allegedly disclosing individually identifiable health information.  The Logan court concluded

that the HIPAA did not provide for a private right of action and it therefore did not have subject

matter jurisdiction over the plaintiff's HIPAA claim.  Accordingly, the claim was dismissed

pursuant to Rule 12(b)(1).  Id. at *4.

Here, the plaintiff challenges, pursuant to the HIPAA, the disclosure of information

regarding his DNA.  Compl. ¶ 19.  Assuming for the sake of argument that the HIPAA prevents

the disclosure of this type of medical information, the plaintiff and not the Secretary of HHS has

initiated this action.  And it is the Secretary who is empowered by the HIPAA to do so.  42

U.S.C. § 1320d-5.  Accordingly, because no private right of action exists under the HIPAA, this

Court does not have subject matter jurisdiction over this claim and it must be dismissed.

**(G)    International Convention of the Elimination of all Forms of Racial Discrimination**

The plaintiff's final cause of action is that the DNA Act and D.C. Code § 22-4151 violate

the International Convention of the Elimination of all Forms of Racial Discrimination ("CERD"),

660 U.N.T.S. 195.  The purpose of the CERD is "to adopt all necessary measures for speedily

eliminating racial discrimination in all its forms and manifestations, and to prevent and combat

racist doctrines and practices in order to promote understanding between races and to build an

international community free from all forms of racial segregation and racial discrimination . . . ."

Id. at *54.  The defendants argue that the plaintiff does not have a private right of action under

the CERD.  Defs.' Mem. at 18.

It is well-established in this Circuit that in order for a party to assert a claim under a

treaty, the treaty (or clauses therein) must confer such a rights.  "Whether a treaty clause does

create such enforcement rights is often described as part of the larger question of whether that

clause [or treaty] is 'self-executing.'" Comm. of United States Citizens Living in Nicaragua v.

Reagan, 859 F.2d 929, 937 (D.C. Cir. 1988).  The Circuit Court "has noted that, in 'determining

whether a treaty is self-executing' in the sense of its creating private enforcement rights, 'courts

look to the intent of the signatory parties as manifested by the language of the instrument.'" Id.

(quoting Diggs v. Richardson, 555 F.2d 848, 851 (D.C. Cir. 1976)).

Only two courts have reviewed the CERD for the purpose of determining whether it is

self-executing and therefore permits a private right of action, both concluding that it did not.

Both the United States District Court for the District of Connecticut in United States v. Perez,

No. 03-02, 2004 WL 935260, at *17 (D. Conn. April 29, 2004) and the United States District

Court for the Southern District of New York in Hayden v. Pataki, No. 00-8586, 2004 WL

1335921, at *7 (S.D.N.Y. June 14, 2004) concluded that the CERD was not self-executing and

thus did not create a private right of action.  Thus, both courts concluded that they did not have

authority to hear claims brought pursuant to the treaty.  This Court agrees.  See International

Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1965, 660

U.N.T.S. 195 (ratified by the United States June 24, 1994); S. Res. of Advice and Consent to

Ratification of the CERD, 103d Cong., 140 Cong. Rec. S7634-02 (daily ed. June 24, 1994) ("the

United States declares that the provisions of the Convention are not self-executing."); see also S.

Res. of Advice and Consent to Ratification of the ICCPR, 102d Cong., 138 Cong. Rec. S4781,

S4783 (daily ed. Apr. 2, 1992) (declaring that "the provisions of articles 1 through 27 of the

Covenant are not self-executing.").  Accordingly, this Court does not have jurisdiction to

entertain claims brought pursuant to the CERD and therefore this claim must be dismissed.

**(G)      Expungement of the Plaintiff's DNA Sample and Its Analysis**

The plaintiff's final argument, and one that is discussed throughout his opposition, is that

since he has now completed his term of probation, the supervisory function served by taking his

DNA sample no longer exists.  Pl.'s Opp'n at 4 (this case "calls upon the Court to decide, among

other things, the heretofore unresolved question of whether a DNA sample collected pursuant to

the DNA Act 'may properly be retained by the government after the felon has finished his or her

term and has paid his or her debt to society.'").  Accordingly, the plaintiff opines that even if he

could have been required to submit a DNA sample earlier, because he is now "free" from

government supervision, the sample would now have to be discarded and the analysis expunged

from the CODIS database.  Id.

In Kincade, Judge Gould, in his concurrence, noted that the court did not decide the issue

of whether a CODIS entry should be erased once the offender has completed his sentence.

Kincade, 379 F.3d at 841 (Gould, J., concurring).  Judge Gould commented, however, that when

this issue is properly presented to that court, it "would presumably need to weigh society's

benefit from retention of the DNA records of a felon against that person's right, in a classical

sense, to privacy." Id. at 842.  Judge Gould noted that in making such a determination the court could arguably make use, through analogy, of fingerprints, which "are routinely maintained in law enforcement files once taken . . . ." Id. at 842 n.3.  However, Judge Gould acknowledged that "unlike fingerprints, DNA stores and reveals massive amounts of personal, private data about that individual . . . ." Id.  A.A. v. Attn'y General of New Jersey, Civil Action No. MER-L-0346-04, December 22, 2004 (N.J. Super. Ct. Law Div.) (Sabation, S.J.C.) is the only case this Court's research has disclosed that directly addresses the issue.  There, the court concluded that "[i]f and when [an individual's] supervised release status ends, the individual's privacy expectations increase and the State's justifications for maintaining the DNA profile decline." Id. at 55.  The court analogized the failure to return an individual's DNA sample and its analysis with the government retaining an individual's property without a forfeiture hearing being conducted or there being a waiver of one's interest in the property. Id. at 56.  Accordingly, the New Jersey Superior Court "engraft[ed], a right of post-conviction expungement upon the [New Jersey] DNA Act as an appropriate measure to save the law's constitutionality." Id. at 56-57.

This Court cannot buy in on the conclusion reached by the New Jersey Superior Court. At the outset, the Court does not find the forfeiture analogy employed by the New Jersey court persuasive.  Specifically, this Court does not believe that a DNA sample is akin to a right in property.  The interest here is a privacy interest in identification information.  As the Ninth Circuit recognized, a DNA sample "establishes only a record of the defendant's identity—otherwise personal information in which the qualified offender can claim no right of privacy once lawfully convicted of a qualifying offense." Kincade, 379 F.3d at 837.  This Court does not believe that an identification record is similar, in any respect, to an interest in property.

Rather, to determine whether an individual's DNA profile must be expunged after that individual's sentence has been completed, this Court must, as Judge Gould posited, balance the individual's privacy interest with the public's interest in maintaining the records.

The Court first starts this analysis with an assessment of the privacy interest at stake.

Although the full measure of the constitutional protection of the right to privacy has not yet been delineated, we know that it extends to two types of privacy interests: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions."

United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d Cir. 1980) (quoting Whalen v. Roe, 429 U.S. 589, 599-600 (1977) (footnotes omitted)).  "[M]atters relating to marriage, procreation, contraception, family relationships, and child rearing and education" fall into the latter category.  Paul v. Davis, 424 U.S. 693, 713 (1976).  "The privacy interest asserted in this case falls within the first category referred to in Whalen v. Roe, the right not to have an individual's private affairs made public by the government."  Westinghouse, 638 F.2d at 577.

The analysis of the privacy interest here requires the Court to determine what interest an individual who was convicted of a qualifying offense and who was therefore required to submit a DNA sample has in that DNA sample once his sentence has been completed.  As discussed earlier, while on probation, an individual has a substantially diminished privacy interest.  As the Ninth Circuit noted in Rise, "[o]nce a person is convicted of one of the felonies included as predicate offenses under [the DNA Act], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from blood sampling."  Rise, 59 F.3d at 1560.  When an individual completes his or her sentence for a predicate offense, the diminished privacy interest is, to some extent, reclaimed.  For example, a

36

former offender's privacy right in his property and person that had been lost while incarcerated or on conditional release are restored.  See. e.g., United States v. Thomas, 991 F.2d 206, 213-14 (5th Cir. 1993) (discussing the restoration of an ex-offender's civil rights under Texas law). However, that individual does not regain in full, the privacy rights possessed by an individual who has never been convicted of a predicate offense.   For example, despite having served their sentences, law enforcement officials routinely retain fingerprints of ex-offenders and even those individuals who were arrested but never convicted of the crime for which they were arrested, and such fingerprints are entered into databases routinely used to help solve both past and future crimes.  See Kincade, 379 F.3d at 842 n.3.  Courts have found that "under the obligations which the  . . . Police Department has in maintaining the public safety and welfare . . . the  . . . Police [are] justified and, indeed, duty-bound to compile and retain arrest records [including fingerprints] of all persons arrested, and the execution of that policy does not violate [a] plaintiff's right to privacy."  Herschel v. Dyra, 365 F.2d 17, 20 (7th Cir. 1966); see also United States v. Schnitzer, 567 F.2d 536, 539 (2d Cir. 1977) ("Retaining and preserving arrest records [including fingerprints] serves important functions of promoting effective law enforcement" and thus expungement is not warranted); United States v. Seasholtz, 376 F. Supp. 1288, 1290 (N.D. Okal. 1974) ("There is a compelling public need for an effective and workable criminal identification procedure.").   In this Circuit, expungement is warranted only when it is proven that an arrest was illegal.[16]  See Humbles v. District of Columbia, No. 97-1924, 2000 WL 246578 (D.D.C. Feb. 18, 2000); Sullivan v. Murphy, 380 F. Supp. 867, 868 (D.D.C. 1974).  Admittedly,

---

[16]  In some instances, juveniles are entitled to have their arrest records, including fingerprints expunged. See Matter of Cluesco, 552 N.Y.S.2d 822 (N.Y. Fam Ct. 1990); but see In Interest of Jacobs, 483 A.2d 907 (Pa. Super. 1984).

fingerprints and a "genetic fingerprint" based on DNA processing are not identical, especially since the amount of identifying information contained in DNA is much greater.[17]   Nevertheless, retention of fingerprints is a generally accepted practice of law enforcement and supports the conclusion that ex-offenders have a reduced expectation of privacy in his or her identity even after their sentences have been completed.

A second example further illustrates this point.   An ex-offender's reduced expectation of privacy in his or her identity is also seen in sex offender statutes.   For example, individuals who are convicted of sexual offenses must, despite having completed their sentences, nevertheless register with local authorities pursuant to state and federal sex offender registration statutes.   See, e.g., D.C. Code § 22-4001 et seq.   These regulations require that ex-offenders provide to local authorities certain identifying information, i.e., their name and addresses.   See, e.g., D.C. Code § 22-4007 (registration information may include: name, aliases, date of birth, sex, race, height, weight, eye color, identifying marks and characteristics, driver's license number, social security number, home address or expected place of residence, and any current or expected place of employment or school attendance).   Moreover, under sex-offender registration statutes, this identifying information can be shared with victims, witnesses, public and private education institutions, day care facilities, members of the public or governmental agencies requesting

---

[17]   The potential that a DNA sample may be "mined" for data far beyond what is necessary for the CODIS database and then shared with private parties or other non-law enforcement entities is curtailed by the structure of the DNA Act.   For example, as noted earlier, information contained in the CODIS database can only be accessed by a small group of individuals. See 42 U.S.C. § 14132(b)(3).   Moreover, the DNA analysis conducted on a sample is only conducted to determine "identification information." See 42 U.S.C. § 14135b(c)(2).   Thus, the Act itself protects the privacy interests of those individuals whose samples are contained in the database.   Moreover, if future technology permits the type of mining of data and analysis about which the plaintiff is concerned and his sample is being used in that manner, he can at that time challenge the new procedures and the use of his sample as being violative of the DNA Act.

information for employment or foster care background checks, the public at large, and any unit of

the police department.  D.C. Code § 22-4011(a)(1)-(5).  The constitutionality of these statutes

have been universally upheld and courts have concluded that they do not violate an ex-offenders

right of privacy.  See, e.g., A.A. ex rel. M.M. v. New Jersey, 341 F.3d 206 (3d Cir. 2003) ("We

conclude that whatever privacy interest the Registrants have in their home addresses is

substantially outweighed by the State's interest in expanding the reach of its notification to

protect additional members of the public."); Paul P. v. Farmer, 92 F. Supp. 2d 410 (D.N.J. 2000)

(same); People v. Malchow, 739 N.E.2d 433 (2000) ("The information defendant contends

should not be disclosed under the Notification Law is not within any of these recognized areas of

the right to privacy" under the United States Constitution); cf. Paul P v. Verniero, 2000 WL

66806, at *5 (D.N.J. 2000) (State procedures for sex-offender information "unreasonably infringe

upon plaintiffs' privacy rights and [the Court ordered] that they be redrafted to reasonably limit

disclosure to those entitled to receive it.").

Compared with the intrusion occasioned by sex offender registries, the privacy

infringement resulting from the retention of DNA results is much more limited.  Here, the DNA

analyses can only be shared with a very limited group (not the public at large), 42 U.S.C.

§ 14132(b)(3), and there are criminal penalties for the improper dissemination of DNA data.  42

U.S.C. § 14135e(c).  It is therefore the Court's conclusion that although individuals convicted of

a predicate offense have an enhanced privacy interest in their identifying information after the

termination of their sentences, that interest is not totally restored (and is certainly not at the same

level as someone who has never been convicted of such offense), and is outweighed by the

compelling government interests associated with the retention of the information.

As to the government's interests, although the need to supervise and monitor qualifying individuals after their conditional release drops out of the picture at the conclusion of their sentences, the government's interests regarding the identify of such individuals remains compelling.  This is so because the government still has a substantial interest in identifying ex-offenders who commit new offense and to prevent them from thereafter committing further crimes.  As already noted, the rate of recidivism among ex-offenders is high.  Crawford, 372 F.3d at 1069-70 (Trott, J., concurring).  In fact, the Department of Justice, Bureau of Justice Statistics reports that "[o]f the 272,111 persons released from prisons in 15 States in 1994, an estimated 67.5% were rearrested for a felony or serious misdemeanor within 3 years, 46.9% were reconvicted, and 25.4% resentenced to prison for a new crime."   Department of Justice, Bureau of Justice Statistics, Criminal Offender Statistics (Dec. 28, 2004) available at http://www.ojp.usdoj.gov/bjs/crimoff.htm.  Thus, "[t]here is a compelling public need for an effective and workable criminal identification procedure."  Seacholtz, 376 F. Supp. at 1290.  Such systems further the government's continued interest in protecting the public and solving criminal offenses committed in the past.  As the District of Columbia Court of Appeals noted in District of Columbia v. Hudson, 404 A.2d 175, 178 (D.C. 1978) (en banc), "[t]he 'retention of arrest records is justified by their potential future usefulness in helping police prevent crimes and apprehend criminals.'"  Id. at 178.  Retaining DNA samples and their analyses serves the same useful purposes.

In balancing these competing interests, the Court first notes that the requirement that a person submit to a DNA sample for testing is not, as discussed when the Court addressed the plaintiff's ex post facto claim, a punitive requirement, but rather one that serves a proper

governmental regulatory function.  Thus, any intrusion into the plaintiff's privacy right is not

punitive in effect or otherwise.  Moreover, as discussed above, the government has a compelling

interest in maintaining this regulatory function through the CODIS database.  This Court

therefore concludes that the government's interest far outweighs the diminished privacy interest

held by the plaintiff even after the completion of his sentence.  Accordingly, the government is

not violating the plaintiff's privacy interest by retaining his DNA sample and its analysis now

that his sentences has been completed.[18]

## VI.   <u>Conclusion</u>

For the foregoing reasons, all of the plaintiff's claims are without merit and must be

dismissed.

**SO ORDERED** this day of 21st day of March, 2005.[19]


REGGIE B. WALTON
United States District Judge

---

[18]  Even if this Court concluded that expungement is required, it is not clear that this Court has before it the proper defendant to order that the DNA sample and its analysis be expunged.  As Laura Hankins, Chief Legislative Counsel for the Public Defenders Service noted, "the FBI, not the District, has custody of the DNA sample."  D.C. Council Report at 13; 42 U.S.C. § 14135b(b) (mandating that DNA samples be given to the FBI for analysis).  Moreover, the FBI, not the District of Columbia maintains the CODIS database.  H.R. Rep. No. 106-900, at 8.  And the FBI is not a defendant in this action, and therefore this Court could not order the defendants before it to provide the relief being requested.

[19]  An Order consistent with the Court's ruling accompanies this Memorandum Opinion.